STEPHENSON *et al. v.* NEW ORLEANS & N. E. R. CO. *et al.*

(Division A.  Dec. 6, 1937.  Suggestion of Error Overruled Jan. 17, 1938.)

[177 So 509.  No. 32877.]

Hannah & Simrall, of Hattiesburg, for appellants.

152

**Leo. J. Hassenauer**, of Chicago, Ill., and **T. Price Dale**, of Hattiesburg, for appellee, F. W. Stange.

J. Blanc Monroe, of New Orleans, La., Heidelberg & Roberts, of Hattiesburg, Sidney S. Alderman, of Washington, D. C., and S. R. Prince, of Washington, D. C., for appellees.

Argued orally by **T. C. Hannah**, for appellant, and by **Sidney S. Alderman** and **Leo J. Hassenauer**, for appellees.

**McGehee, J.**, delivered the opinion of the court.

The appellants, W. A. Stephenson and others, who for the past several years have been and are now employed as train dispatchers of the appellee, New Orleans & Northeastern Railroad Company, and located and working at Hattiesburg, Miss., dispatching said company's trains

between Meridian, Miss., and New Orleans, La., brought this suit in the chancery court of Forrest county, Miss., seeking to enjoin the appellee railroad company from violating the seniority rights of said employees under a contract of September 1, 1929, executed by and between H. W. Miller, vice president of the several railroad companies comprising what is known as the Southern Railway System, and F. W. Stange, as general chairman of the American Train Dispatchers' Association, for and on behalf of each of the separate railroad companies and the respective train dispatching employees thereof. There was an original, amended, and amended and supplemental bill of complaint filed, and demurrers were sustained to the original and amended bills. The case was finally heard and determined upon the amended and supplemental bill of complaint, and upon the separate answers of the appellees, New Orleans & Northeastern Railroad Company and F. W. Stange, in each of which there was embodied a demurrer, and also upon oral and documentary evidence. The decree of the court below dismissed the appellants' bill on the merits on final hearing and dissolved the interlocutory injunction previously granted, but superseded the effect of the decree dissolving the injunction pending this appeal here.

At the time of the execution of the contract sought to be enforced by the appellants in this suit, the appellee F. W. Stange, who was made a party to the suit and personally served with process upon the insistence by the appellee railroad company that he and others were necessary and indispensable parties thereto, was employed as a train dispatcher on the Alabama Great Southern Railroad, and has since continued as such employee. The controversy in this case was inspired, and has been kept alive, by the appellee F. W. Stange, by reason of his insistence on a certain interpretation and application being given to two certain paragraphs of the contract. These pertinent paragraphs are headed "Seniority," and are as follows:

"Article 4.

". . . (b) Train dispatchers' seniority shall be limited to one superintendent's jurisdiction. . . .

"(m) When, for any reason, two or more dispatchers' offices are consolidated, seniority of such offices shall be pooled. Train dispatchers affected shall have prior rights to corresponding positions in these consolidated offices, carrying their seniority with them. After such rights have been exercised, seniority rules will govern. If consolidation results in force reduction, if qualified, oldest men shall have prior rights to positions remaining."

In view of the conclusion that we have reached and the decision that we are rendering in this case, we feel that the scope of the litigation, and the issue involved, as to whether an award of the National Railroad Adjustment Board should be disregarded as a nullity for want of jurisdiction of the subject-matter of the dispute in question, make it both necessary and proper that the various steps taken during the pendency and progress of the controversy which finally culminated in the award being made by such National Railroad Adjustment Board, which was organized under the act of Congress known as Railway Labor Act 1934, 48 Stat. 1185, 45 U. S. C., sections 151-164 (45 U. S. C. A., sections 151-164), amending Railway Labor Act 1926, 44 Stat. 577, to settle disputes between a carrier and its employees, should be set forth in this opinion with sufficient clarity and detail to make clear our views on the issue involved.

It must be kept in mind that the Southern Railway System is a name used merely for convenience in the operation of the affiliated railroad corporations comprising the System; that the Southern Railway System is not itself a corporation or legal entity; that it is not a signatory contract sued on; that the railroad corporations comprising the System are the Southern Railway Company, the Cincinnati, New Orleans & Texas Pacific Railway Company, the Alabama Great Southern Railroad

Company, New Orleans & Northeastern Railroad Company, Georgia Southern & Florida Railway Company, Harriman & Northeastern Railroad Company, and Northern Alabama Railway Company, all of which were separate and distinct carriers, separate and distinct corporations, with separate and distinct boards of directors and officers, conducting separate and distinct businesses. And referring, for the purposes of this decision, to two of these companies, it is to be noted that the appellee New Orleans & Northeastern Railroad Company is a corporation owning and operating, in interstate commerce, an interstate line of railroad extending from Meridian, Miss., through Hattiesburg, Miss., to New Orleans, La., and the Alabama Great Southern Railroad Company is a corporation owning and operating, in interstate and intrastate commerce, an interstate line of railroad extending from Chattanooga, Tenn., through parts of Tennessee, Georgia, and Alabama (passing through Birmingham and York) to Meridian, Miss., where it connects with the northern end of the line of the New Orleans & Northeastern Railroad Company.

Pursuant to the terms of the contract, which became effective as aforesaid on September 1, 1929, a seniority list of all train dispatchers on each of these two railroad companies (and we assume that this was true as to the other affiliated railroad corporations comprising the Southern Railway System) was compiled and kept available for inspection by the train dispatchers in their respective offices. These seniority lists were to be revised in January of each year, and the record shows that as of January 1, 1932, the seniority lists of the New Orleans & Northeastern Railroad Company carried the names of these appellants and others, and that the seniority lists of the Alabama Great Southern Railway Company as of that date carried the name of the appellee F. W. Stange, and others, giving the date of employment of each dispatcher, and hence his seniority.

Prior to October, 1931, and at the time of the execu-

tion of the contract in question, the line of the New Orleans & Northeastern Railroad Company was operated as one operating division of the Southern Railway System, with a division superintendent and his office force located at Hattiesburg, and having operating jurisdiction only over the New Orleans & Northeastern line. Prior to that date the line of the Alabama Great Southern Railroad Company was operated as another operating division of the Southern Railway System, with a division superintendent and his office force located at Birmingham, and having jurisdiction only over the lines of the Alabama Great Southern Railroad Company.

In October, 1931, Mr. J. G. Clements, who had been the division superintendent of the Alabama Great Southern Railroad Company, was appointed division superintendent of the New Orleans & Northeastern Railroad Company, in addition to retaining his position and duties as division superintendent of the Alabama Great Southern Railroad Company. The two divisions, or the operations of the two railroads, were thus brought under the jurisdiction of one individual in the dual capacity of division superintendent of each railroad; but there was no consolidation of the divisions. Each railroad continued to be separately operated as a separate division of the System; that is to say, as a separate and distinct railroad. Thereupon, the appellee F. W. Stange became vitally and personally interested in a consolidation of the two train dispatchers' seniority lists, for the reason, as will later appear, that he wanted to obtain a position as train dispatcher with the New Orleans & Northeastern Railroad Company to the displacement of some of the appellants, and without regard to whether this railroad company might choose to employ his services. He thereupon contended that paragraph (b) of article 4, hereinbefore referred to, and which reads "Train dispatchers' seniority shall be limited to one superintendent's jurisdiction," meant that the seniority of dispatchers on the seniority lists of these two separate

and distinct railroads should be coextensive with the superintendent's jurisdiction; that is, extend over both the Alabama Great Southern and the New Orleans & Northeastern Railroads, and that to accomplish this, the two seniority lists should be pooled, or consolidated. But the managements of these railroad companies, through Mr. C. D. Mackay, assistant vice president of these two railroads, as well as of the other System lines, took the position that the said paragraph (b) of article 4 was a provision of limitation, and not of coextension; that it merely meant that dispatchers' seniority should not extend further than one superintendent's jurisdiction; that it did not mean that dispatchers' seniority should be coextensive with one superintendent's jurisdiction; that especially could it not have such a meaning where one superintendent had jurisdiction over two separate corporate railroads, each operating its railroad business separate and distinct from the other and with the right to select its own employees, since to make seniority of dispatchers coextensive with such dual official jurisdiction would be to make seniority of dispatchers employed by one railroad extend over another railroad of which they were not employees at all. We think this contention of these two railroads in answer to the contention being made by the American Train Dispatchers' Association, through appellee F. W. Stange, was perfectly sound and logical.

It cannot be assumed that it was the intention or within the contemplation of any of the separate and distinct railroad corporations who were signatories to the agreement, or the intention or within the contemplation of any of the employees of these respective railroads represented by F. W. Stange, who signed the agreement on their behalf, that seniority should enable employees to be moved like checkers on a board from the employ of one railroad to another throughout the operation service of two or more railroads comprised in the System in the event of one person being made superintendent over them for

convenience or economy, the result of which would mean that a railroad corporation owning and operating its own separate and distinct business and selecting its own employees would be required to accept the services of men whom they had not employed, or may not choose to employ. In other words, paragraph (b) of the said article 4 of the contract is subject only to the interpretation that when the offices of two division superintendents on the line of the same railroad corporation were consolidated, there should be a pooling or consolidation of the seniorities of the employees then working under the two divisions of such railroad.

In June, 1932, the same change which had been made in October, 1931, as to the position of division superintendent was also made as to the position of another official, the chief dispatcher. The man who was chief dispatcher of the Alabama Great Southern Railroad Company at Birmingham was also appointed chief dispatcher of the New Orleans & Northeastern Railroad, and held thereafter both positions previously held by two men. Still there was no consolidation of the offices of the dispatchers within the meaning of paragraph (m) of article 4 of the contract hereinbefore quoted. The one for the Alabama Great Southern Railroad remained at Birmingham, and the one for the New Orleans & Northeastern Railroad remained at Hattiesburg. Therefore, the same situation was again presented as to whether a pooling of the two seniority lists was called for. Thereupon, appellee F. W. Stange, purporting to act for the American Train Dispatchers' Association, but in truth and fact in furtherance of his own desire to displace a train dispatcher of the New Orleans & Northeastern Railroad Company, again presented to Mr. Mackay the same contention that the two seniority lists should be pooled and consolidated, which request was again refused by Mr. Mackay, acting as vice president of both the Alabama Great Southern and New Orleans & Northeastern Railroad companies.

At that time the Railway Labor Act of 1926 (44 Stat. 577) was in force and effect, and under the provisions of that law the System Adjustment Board of the Southern Railway System was set up for the adjustment of labor disputes, which could not be settled with the managements of the carriers. This board was composed of representatives of the managements and of labor. When Mr. Mackay refused to accede to the contention being made by Stange for the pooling of the two seniority lists, Stange brought the matter before this System Adjustment Board; but no agreement was reached regarding the controversy. Thereupon, Stange requested Mackay to join in a submission of the controversy to a Board of Mediation, which had also been created under the Labor Act of 1926, but which had no judicial powers and was merely set up as an aid to mediation and compromise of railway labor disputes. The managements did not think that a dispute between an employee of one railroad and employees of another railroad was a proper matter to go to the Board of Mediation as a dispute between a carrier and its employees, and declined to join in submitting the controversy to such board.

Thereupon Stange, again attempting to act for the American Train Dispatchers' Association, submitted the matter to the Federal Board of Mediation, ex parte, and the board assigned a mediator and attempted to adjust the controversy. The mediator proposed to the managements that they hold a joint conference of representatives of the Alabama Great Southern dispatchers or of the association on the one hand, and of the New Orleans & Northeastern dispatchers on the other, to see if the controversy could not be disposed of by mutual agreement, for a division of the work between the respective train dispatchers of the two railroads. And while the managements had no personal or pecuniary interest in such a controversy, it appears that they made no objection to such conferences being held, and the same were called and were held in January, 1933, at Hattiesburg,

Miss. At the conference, a Mr. Austin, as assistant vice president and assistant superintendent of the managements, represented the two railroads, while Stange was present purporting to represent the interest of the American Train Dispatchers' Association, and there was also present all the appellants in this suit representing the interests of the New Orleans & Northeastern train dispatchers. Mr. Austin stated the position of the managements of both railroads in refusing to pool their respective seniority lists, and submitted for consideration the suggestion of the Board of Mediation for settlement on a voluntary agreement for a division of the work. The proposal was declined by the train dispatchers of the New Orleans & Northeastern Railroad. A compromise offer was then made at this conference at Hattiesburg, that if two of the train dispatchers of the New Orleans & Northeastern Railroad Company, appellants Stephenson and Bilbo, would vacate their positions as to seniority with their employer and thereby take care of the appellee Stange, the whole dispute would be dropped; and it appears from the record that this proposition of settlement extended to Stange only, and not to the other train dispatchers of the Alabama Great Southern Railroad. This offer of compromise was likewise declined, and we think rightfully so. It also revealed that Stange was the real party in interest on the one hand, and that the train dispatchers of the New Orleans & Northeastern Railroad were the real parties in interest on the other hand, and shows that his contention on the trial of the case to the effect that the American Train Dispatchers' Association, the Alabama Great Southern train dispatchers and the said railroad, were proper or necessary parties, is without merit. Immediately following this conference, a report to that effect was made, by letter of January 11, 1933, to the Federal Board of Mediation. Thereupon, the Board of Mediation suggested that the controversy be submitted to arbitration. This proposal was declined by the carriers, because they did not feel

that it was proper for them to subject the seniority rights of the train dispatchers of the New Orleans & Northeastern Railroad to an arbitration award, even if they had been vested with the power and authority to do so, since the companies involved were separate corporations; and, evidently, for the further reason that they did not think that there was any merit in the contentions being made by Stange in his effort to defeat the seniority rights of these particular train dispatchers existing between them and their employer.

The Board of Mediation then advised that the machinery of mediation set up under the Railway Labor Act of 1926 had been exhausted, and that its services were at an end. The result of this action was that there was nothing left to be done under the Railway Labor Act of 1926, and the controversy was thereby ended.

On June 21, 1934, the amended Railway Labor Act, 48 Stat. 1185, 45 U. S. C., sections 151-164 (45 U. S. C. A. sections 151-164), was enacted by Congress, and under which the National Railroad Adjustment Board was established. This was an act to amend the Railway Labor Act of 1926, and to provide for the prompt disposition of disputes between carriers and their employees, as stated in the title of the act and as shown by the provisions of the act itself. But there was no dispute between a carrier and its employees involved in the controversy hereinbefore set forth. No power or authority, either expressly or impliedly, was conferred upon the National Railroad Adjustment Board by Congress under the provisions of this Railway Labor Act of 1934 to dispose of or settle disputes between the employees of two separate and distinct railroad corporations, or even a dispute between the employees of one railroad corporation.

To give the National Railroad Adjustment Board jurisdiction, it is necessary that there be a dispute submitted to it for settlement between a carrier on the one side and its employees on the other. In the case at bar, there

was no dispute whatever between the New Orleans & Northeastern Railroad and any of its employees; there was no dispute between the Alabama Great Southern Railroad and any of its employees relating to the service of employees to such carrier.

After the establishment of this new quasi-judicial board, which was given certain judicial powers, and not merely mediatory functions such as the old Board of Mediation had under the Railway Labor Act of 1926, the appellee Stange again took this dispute up with Mr. Mackay, who was still serving as vice president of these two carriers, and asked that the carriers join the American Train Dispatchers' Association in submitting the dispute to the said Adjustment Board. This Mr. Mackay refused to do, and contended that the dispute was not "pending and unadjusted" within the meaning of the Railway Labor Act of 1934, and that the National Railroad Adjustment Board was, therefore, without jurisdiction, since all of the machinery set up under the Railway Labor Act of 1926 had been exhausted and the matter was at an end long prior to the enactment of the Railway Labor Act of 1934. Thereupon, appellee Stange submitted the controversy to this new adjustment board in the name of the American Train Dispatchers' Association on January 9, 1935, as a dispute between the said American Train Dispatchers' Association and the Southern Railway System, although the Southern Railway System was not a legal entity or corporation, and no award against the same was enforceable. On January 10, 1935, the Adjustment Board wrote Mr. Mackay advising him of the "submission" of the question, and called for the carrier's "submission" in response.

On January 23, 1935, Mr. Mackay wrote the secretary of the board, stating that the controversy had arisen in October, 1931, and had been carried through all of the stages provided under the Railway Labor Act of 1926; set forth his position that it was not a case "pending and unadjusted" at the date of the enactment of the Rail-

way Labor Act of 1934; and that, therefore, the Adjustment Board had no jurisdiction of the matter. Thereafter, the answers of the Alabama Great Southern and New Orleans & Northeastern Railroad companies to the "submission" of the petitioner were forwarded to the Adjustment Board by Mr. Mackay, and its attention was called to the fact that the dispatchers of the New Orleans & Northeastern Railroad Company were parties in interest and should be notified if a hearing upon the merits was to be had. And paragraph (j) of section 3 of the Railway Labor Act of 1934 (45 U. S. C. A., sec. 153 (j) ) expressly provides that the Adjustment Board "shall give due notice of all hearings to the employee or employees, and the carrier or carriers involved in any disputes submitted to them." Responding, however, to the suggestion of Mr. Mackay, as to notice to these employees, the Third Division of the Adjustment Board, before which the dispute was pending, advised that it was not disposed to give such notice, but that if either of the parties to the dispute desired to do so, they could arrange for the appearance at the hearing of any employees directly involved. Thereupon, Mr. Mackay notified all parties in interest, and the appellant Stephenson attended the hearing in the present case representing all of the train dispatchers of the New Orleans & Northeastern Railroad Company. His appearance was formally noted by the board on its appearance sheet for the hearing.

It is contended by the appellants that since they were not formally made parties to the proceeding before the Adjustment Board, they are for this reason not bound by the action taken by the board under the proceeding. However, we are of the opinion that the authorities sustain us in the view that since the proceedings before a quasi-judicial board are informal, the appellants cannot complain of the lack of formal notice since they appeared at the hearing and participated therein.

But this does not dispose of the real issue in the case,

which is the question as to whether or not the Adjustment Board had any jurisdiction of the subject-matter on which it made its award.

It must be kept in mind that the appellee carrier was in full accord with the contention of its train dispatching employees and that their relations were altogether harmonious in contending for the same principle throughout the entire history of the controversy, and that both the appellee carrier and its employees made the same contention before the Adjustment Board at the hearing or the preservation of the seniority rights of the appellants with the appellee carrier as their employer. This peaceful and harmonious relation was disturbed only by the action of the Adjustment Board in making an award following such hearing, which required the appellee carrier to consolidate its seniority list with that of the Alabama Great Southern Railroad Company, and by the subsequent action of the appellee carrier in giving notice to the appellants of its intention to abide by the terms of the said award, and which notice resulted in the bringing of this suit and the issuance of the temporary injunction in this case to prevent a violation of the seniority rights given appellants under the contract of September 1, 1929.

In taking jurisdiction of this dispute between the employees of these two separate carriers, the Adjustment Board took cognizance of it as a ''pending and unadjusted'' dispute at the date of the enactment of the Railway Labor Act of 1934, whereas the dispute was, in fact, not pending at the date of the passage of this act, but was ended March 9, 1933, when all of the machinery of mediation set up under the Railway Labor Act of 1926 had been exhausted, and on which date the Board of Mediation under said act of 1926 had notified the parties in interest that its services were at an end. The dispute may have been ''unadjusted,'' but it was not ''pending'' before any board or tribunal at the time of the enactment of the Railway Labor Act of 1934. However, if the juris-

diction of the National Railroad Adjustment Board under the act of 1934 had depended solely on this quasi-jurisdictional fact, and the said board had found this fact in favor of its jurisdiction, as it did do in the present case, its award and judgment could not under general principles, be attacked in this collateral proceeding for want of jurisdiction. Therefore, we must assume for the purposes of this decision that the dispute was one "pending and unadjusted." Noble v. Union River Logging R. Co., 147 U. S. 165, 13 S. Ct. 271, 37 L. Ed. 123; Toy Toy v. Hopkins, 212 U. S. 542, 29 S. Ct. 416, 53 L. Ed. 644; Burke v. Southern Pacific R. Co., 234 U. S. 669, 710, 34 S. Ct. 907, 58 L. Ed. 1527; Hartford Life Ins. Co. v. Johnson (C. C. A. 8th), 268 F. 30, 33, 34; Cole v. Blankenship (C. C. A. 4th), 30 F. (2d) 211; National Park Bank v. Mc-Kibben & Co. (D. C. Ga.), 43 F. (2d) 254; Greene v. Uniacke (C. C. A. 5th), 46 F. (2d) 916; Cason v. Cason, 31 Miss. 578; Cannon v. Cooper, 39 Miss. 784, 80 Am. Dec. 101; De Ford v. Furniss, 43 Miss. 132, 151; Cocks v. Simmons, 57 Miss. 183; Fiehe v. R. E. Householder Co., 98 Fla. 627, 125 So. 2, 13; Ward v. Board of Commissioners, 199 Ind. 467, 157 N. E. 721; Estes v. Union Terminal Co. (C. C. A. 5th) 89 F. (2d) 768, 771; Act of 1934, 48 Stat. 1185, 45 U. S. C., secs. 151-164 (45 U. S. C. A., secs. 151-164); 1 Freeman on Judgments (5 Ed), secs. 334, 335, 344, 350 and cases cited; 15 Ruling Case Law, Judgments, section 336, pages 862, 863; 337, p. 863; 342, p. 867; and cases cited; 34 Corpus Juris, Judgments, secs. 815, 816, 826, 827, 834 (cases cited p. 532, notes 28 and 29), 851 (cases cited p. 553, notes 44, 45, 51), and 852 (cases cited p. 554).

However, this Adjustment Board did not adjudicate as a quasi-jurisdictional fact that the dispute on which its awards was made was a dispute between a carrier and the employees of such carrier; a fact the existence of which was essential to its jurisdiction of the subject-matter under the Railway Labor Act of 1934. Instead of such fact having been adjudicated in favor of its juris-

diction, the entire proceeding before the board, and the award itself by its very terms, shows that the board was dealing only with a dispute between the employees of two separate and distinct carriers. Unless Congress had conferred upon this Adjustment Board general jurisdiction of the subject-matter of a dispute between employees of two separate and distinct carriers, it would not require any argument or citation of authorities to show that the award made by the Adjustment Board, whereby it undertook to order these two separate and distinct carriers to pool or consolidate their respective seniority lists of train dispatchers, could be attacked collaterally, or ignored as an absolute nullity in any of the courts of the land, either state or federal, where the same is involved.

When the dispute was heard before the Adjustment Board, the members thereof, who are not required by the act of 1934 to be men of legal learning, divided equally, both as to the jurisdiction of the board and as to the merits of the controversy. Pursuant to provisions of this amended Railway Labor Act, a referee was appointed to sit with the board to break the deadlock. Before arriving at a decision of the questions involved, he wrote a letter to the chairman of the Third Division of the Adjustment Board, before which the dispute was pending, and suggested that the parties to the controversy again attempt to settle the matter at issue by voluntary agreement, and among other things said: "There are many angles in this dispute which if forced to a final decision by the Referee, could and probably would embarrass both of the contesting parties at some subsequent time. Without in any way attempting to indicate what my final decision may be, I have come to the conclusion after much study of the file, that the rules relied upon by both parties in support of their respective positions were not drawn to cover the circumstances which are involved in this dispute. Bad precedent might be established irrespective of the way the decision may fall."

Upon the failure of the parties to arrive at a voluntary settlement, the referee broke the deadlock by making the award in question, and the board formally ordered the two carriers to put the award into effect. And while the carriers have at all times contended that the Adjustment Board had no jurisdiction of this dispute and had urged this contention before the Adjustment Board on behalf of the train dispatchers of the New Orleans & Northeastern Railroad, the award is set up as a defense to the present suit. It should be said, however, that the appellee carrier does now contend that the Adjustment Board did have general jurisdiction of the subject-matter. This award is as follows: "The seniority roster of the Birmingham A. G. S. office and the Hattiesburg N. O. & N. E. office will, therefore, be merged into one common roster and the names dove-tailed, according to seniority, and the seniority of all those shown thereon shall be extended to all schedule positions under the jurisdiction of one superintendent, and Mr. McLarn shall be assigned to the position held by the junior regularly assigned Train Dispatcher on this consolidated roster. This Award is made, however, with the understanding that in case different superintendents, at any future time, shall be appointed on the N. O. N. E. and the A. G. S. or in case either the N. O. N. E. or the A. G. S. is withdrawn from the Southern Railway System, then and in such event, any employee affected by this Award shall have the right to have his seniority rights restored in the same manner as though this Award had never been made."

It will be observed that this award shows on its face that the Adjustment Board was attempting to deal with a dispute involving the seniority rights of the employees of two separate and distinct carriers, and was attempting to exercise a power not conferred by the Railway Labor Act of 1934. Moreover, the award, if put into effect, would not effectuate any purpose intended to be served by the act. Immediately following a compliance

with the terms of the award, the respective carriers could restore unto the train dispatchers of the New Orleans & Northeastern Railroad Company their seniority rights by the simple method of again placing a division superintendent on the New Orleans & Northeastern Railroad at its Hattiesburg office and a division superintendent over the Alabama Great Southern lines at its Birmingham office, instead of having one division superintendent serve in both capacities. The prompt restoration of these seniority rights is made possible by such action under the very terms of the award, which provide that: "In case different superintendents, at any future time, shall be appointed on the N. O. N. E. and the A. G. S., . . . then and in such event, any employee affected by this Award shall have the right to have his seniority rights restored in the same manner as though this Award had never been made."

The referee, in his finding on which the award was made, and which appears in the record, and as shown in the vigorous dissent rendered by four members of the Adjustment Board, reached the conclusion that the word "limited" in article 4 (b) of the contract sued on in this case was "awkwardly used," and that the adjective "co-extensive" should be substituted for the verb "limited." But there is nothing in the context of article 4 (b), or elsewhere in the contract, to suggest that the language used does not express the true intent of the parties thereto.

As hereinbefore stated, the appellee carrier has conceded all the while that the contention of the appellants as to the proper interpretation and application of the contract sued on is correct, and that although this contract was collectively executed by the several separate and distinct railroad corporations on the one hand and by the American Train Dispatchers' Association for the employees of the respective railroad corporations on the other hand, the same nevertheless amount to several agreements between each railroad and its own dispatchers.

And the record shows that each railroad corporation as signatory thereto, and the respective employees of each of said railroad corporations have so regarded and treated the contract, except the appellee Stange, and have construed and interpreted its provisions in accordance with the contention of the appellants as to the separate and distinct seniority rights of each separate group of employees of each separate and distinct railroad. It would seem to be the announcement of a most novel principle of law for any court in this country to hold that a quasi-judicial board has jurisdictional power and authority to require a common carrier to displace those in its employ and accept in lieu thereof the service of those in the employ of another carrier, contrary to the wishes of either of the carriers involved. And it would be nonetheless novel for a court to give to the terms of a labor contract, made between several carriers and their respective employees merely for the sake of uniformity of seniority rights and other privileges among them as a general class, such an interpretation and application as is contended for by appellee Stange.

Congress did not empower the Adjustment Board to impair the obligations of an existing contract or to disturb the harmonious relations existing between a carrier and its employees. It is true that the Third Division of the Adjustment Board is given jurisdiction over disputes involving train dispatchers, but the whole context of the Railway Labor Act of 1934 shows that the disputes referred to are disputes between a carrier and its own employees, and not between the employees of two separate and distinct carriers. Under this act it is provided that: "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier

growing out of any dispute between the carrier and the employees thereof." Section 2, subd. 1 (45 U. S. C. A., section 152, subd. 1).

One of the purposes of the act is defined to be "to avoid any interruption to commerce or to the operation of any carrier engaged therein" (section 2 [45 U. S. C. A., section 151a]), and the very title of the act itself sets forth the only purpose thereof as being "to amend the Railway Labor Act approved May 20, 1926, and to provide for the prompt disposition of disputes between carriers and their employees." 48 Stat. 1185. And, in our opinion, it embraces only disputes between a carrier on the one hand, and the employees on the other. Therefore, we have reached the conclusion that the Adjustment Board was wholly without jurisdiction of the subject-matter of this dispute between an employee of one carrier and the employees of another separate and distinct carrier, and that the award, which is plead as a defense in the present case to the right of the appellants to enforce a recognition of their seniority rights as train dispatchers of the appellee carrier, is an absolute nullity, binding on no one; that the appellants were entitled to ignore and disregard the said award as a nullity; and that only appellants and the appellee carrier were proper, necessary, or indispensable parties to this suit for injunctive relief, for the reason that the subject-matter of this litigation consists solely and alone in the right of the appellants to have the appellee carrier to recognize their seniority rights under the contract sued on.

It is earnestly insisted by appellees that the court below was without jurisdiction, because of the absence of necessary and indispensable parties. This position would be well taken in a direct proceeding to annul the award of the Adjustment Board, but it is well settled that an order or judgment of any board or judicial tribunal which appears on its face to be absolutely void for want of jurisdiction of the subject-matter may be attacked collaterally and disregarded as a nullity.

On the question of necessary parties, the rule in this state is announced in Griffith's Chancery Practice, paragraph 102, as follows: "All persons who are materially interested, legally or equitably, in the subject matter of the suit ought to be made parties therein, either as complainants or as defendants. And of course the converse is equally controlling, that is, that persons wholly without material interest in the suit should not be made parties."

Other than appellants and appellee carrier there is no one materially interested, either legally or equitably, in the subject-matter of this suit; the right of appellants to have their seniority rights under the contract recognized and respected, except it be appellee Stange, who was made a party by personal service of process and is now one of the litigants. No one else has ever asserted any interest in the controversy throughout its entire history covering a period of at least five years. Written notice, not as constituting legal process, was sent by the appellee carrier prior to the trial of the case to all parties alleged to be necessary or indispensable to confer jurisdiction, and none of them have yet manifested any interest in the suit, unless it can be said that the appearance and participation amicus curiæ of the counsel for the American Train Dispatchers' Association, who is one of the counsel of record for appellee Stange, indicated some interest on the part of such association, but which interest, if any, it did not undertake to assert by intervening as a party, after ample opportunity afforded so to do.

The award of the Adjustment Board is for the reasons hereinbefore set forth merely incidental, and being a nullity for want of jurisdiction of the subject-matter thereof, it may be disregarded for the purposes of the present litigation.

It was held by the Supreme Court of the United States in the case of Traux v. Raich, 239 U. S. 33, 36 S. Ct. 7, 9, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B,

283, that: ''The right to earn a livelihood and to continue in employment unmolested by efforts to enforce void enactments should similarly be entitled to protection in the absence of adequate remedy at law. It is said that the bill does not show an employment for a term, and that under an employment at will the complainant could be discharged at any time, for any reason or for no reason, the motive of the employer being immaterial. The conclusion, however, that is sought to be drawn, is too broad. The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others. The employee has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion and, by the weight of authority, the unjustified interference of third persons is actionable although the employment is at will.''

Answering the contention of the appellee carrier to the effect that it must obey the terms of the award of the Adjustment Board by pooling its seniority lists of train dispatchers with that of another separate and distinct railroad in violation of the property rights of its own employees, it should be observed that under the Railway Labor Act of 1934, the award of the Adjustment Board is not a self-executing order. The act contemplates that the carrier is not bound at all events to obey the award, but may litigate the question at issue in the United States District Court, a judicial tribunal, and not a quasi-judicial board, whenever the petitioner, or other person for whose benefit the award is made, shall undertake to enforce the same; and no penalty is prescribed for a failure to comply with the award. Neither the carrier nor the employee against whose interest an award has been made is given any right under the act to go into the United States District Court as a party plaintiff or complainant. Then, most assuredly the employees of a carrier against whose interest and seniority rights an award has been made are not left

without remedy in all of the courts of the land. As held in the case of Griffin v. Chicago Union Station Co. (D. C.), 13 F. Supp. 722, the seniority rights of an employee constitute property within the meaning of the Fifth Amendment to the Federal Constitution. Paragraph (p), section 3 of the Railway Labor Act of 1934 (45 U. S. C. A., section 153(p) ), provides that: "If a carrier does not comply with an order of a division of the Adjustment Board within the time limit in such order, the petitioner, or any person for whose benefit such order was made, may file [suit] in the District Court of the United States."

In the case of Lane v. Union Terminal Company (D. C.), 12 F. Supp. 204, 205, construing the Railway Labor Act of 1934, the court said: "The act is silent, insofar as authority is concerned, for any person to enter the national court, save and except the 'petitioner,' or 'or any person for whose benefit such order was made.' The defeated has no right to enter court. He is given no privilege of court review." In other words, there is no federal question involved in an effort on the part of an employee to enforce his seniority rights under a contract, as was held in the case of Malone v. Gardner (C. C. A.), 62 F. (2d) 15, and Parrish v. Chesapeake & O. Railway Co. (C. C. A.), 62 F. (2d) 20, wherein the employee asserted jurisdiction by reason of the then Federal Railway Labor Act of 1926. And in the case of Parrish v. Chesapeake & O. Railway Company, supra, a rehearing was denied by the United States Supreme Court. In that case the court pointed out that there was no specific provision in the act of 1926 applicable to the controversy at issue. This is likewise true as to the act of 1934 so far as the controversy here is concerned, regarding the right of the employee to go into the United States District Court to obtain relief. Hence, such an employee who has lost his cause before the Adjustment Board must necessarily resort to a state court of competent jurisdiction, or lose the property rights in-

volved in a seniority contract with his employer, unless other grounds of federal jurisdiction are present than the fact that Congress has conferred upon a quasi-judicial board the authority to deal with disputes between a carrier and its employees.

It is next insisted by appellees that a state equity court has no jurisdiction to grant relief by injunction in a case of this kind, and they cite Chambers v. Davis, 128 Miss. 613, 91 So. 346, 22 A. L. R. 114, and Sims v. Vanmeter Lumber Co., 96 Miss. 449, 51 So. 459. It was held in these cases that a court of equity would not decree the specific performance of a contract for rendition of personal service. However, in the case at bar, the appellants are not undertaking to require the appellee carrier to retain them in its service, but rather they seek to have the carrier recognize their seniority rights during such time as they may remain in the service of the carrier. One of the reasons given for the holding of the court in Sims v. Lumber Company, supra, was the fact that it would require the constant superintendence of the court from day to day for an indefinite time in order to enforce the carrying out of its decree. And the case of Chambers v. Davis, supra, was rendered by a divided court, and the rule therein announced was distinguished in the case of Mississippi Theatres Corporation et al. v. Hattiesburg Local Union No. 615, 174 Miss. 439, 164 So. 887, 890, wherein it was held that the motion to dissolve an injunction was properly overruled, and wherein the court said: "All of the prestige and power of the labor unions, as such, are destroyed if their contracts may be disregarded by a court of equity, leaving it without remedy. It is not an attempt to force the employer to continue in service any particular individual. In that sense it is not personal service, it is the service of a mass of employees; if one is unsuitable and incompetent, then the union is prepared to furnish another who is satisfactory. In order to maintain the principle of collective bargaining, and to preserve the rights of each party to the con-

tract, it is essential that on breach of contract, such as is alleged here, a court of equity should not be powerless and its arm should not be shortened to prevent its affording relief. The prestige and authority of the labor union to enforce obedience to its contracts, entered into with the employer, must be recognized. Otherwise, a suit for damages on the part of the union would be met immediately with the proposition that it had lost no specific amount by the breach of the contract; that it had not contracted to furnish a particular individual to render personal service.''

In the case, supra, the court expressly held that a contract made between a labor union and an employer on behalf of its members could be enforced in a court of equity by injunction to prevent a violation of the contract, saying that this principle was well established. The present suit is to enforce the seniority rights of a group of train dispatchers as a class of employees, and can be maintained by the appellants as a class of the employees covered by the contract, made with their employer for their benefit by the American Train Dispatchers' Association, to the same extent that the same could be maintained in the name of the union against the employer. In fact, it was expressly held in the case of Yazoo & M. V. Railroad Co. v. Sideboard, 161 Miss. 4, 133 So. 669, although not involving an injunction or suit in equity, that under the modern trend of judicial decisions in the advancement of law the rights and privileges contracted for in labor agreements are primarily for the individual benefit of the members of the organization, and that the rights secured by such contract or agreements are the individual rights of the individual members of the union, and that the same might be directly enforced by the individual.

We are therefore of the opinion that the lower court had jurisdiction of the subject-matter of the suit, and of all parties who had any beneficial interest therein, and that the case made by the record entitled the appellants

to the relief prayed for. Decree will be rendered here accordingly, reinstating the injunction and making the same permanent.

Reversed, and decree here for appellants.